1  ROBERT K. MAYBERRY
   1146 West 89th Street
2  Los Angeles, California 90044

3  Plaintiff



4

5

6

7   **ORIGINAL**

8           **UNITED STATES DISTRICT COURT**

9           **CENTRAL DISTRICT OF CALIFORNIA**

10                **WESTERN DIVISION**

11  **ROBERT K. MAYBERRY,**          )  2:20-cv-00224-JLS(JDE)

12              Plaintiff,            )
                                      )  **FOURTH AMENDED COMPLAINT**
13  vs.                              )
                                      )  (Damages for Deprivation of Civil
14  **ALEJANDRO VILLANUEVA, LOS**    )       Rights)
    **ANGELES COUNTY DEPUTY**        )
15  **SHERIFFS CRAWFORD,**           )
    **ALVARADO,** and **20 UNKNOWN** )       **JURY DEMAND**
16  **NAMED DEFENDANTS, WHO**        )
    **ARE LOS ANGELES COUNTY**       )    Mag. Judge John D. Early
17  **DEPUTY SHERIFFS WHO**          )
    **ARRESTED PLAINTIFF, WHO**      )
18  **ESCORTED PLAINTIFF, AND**      )
    **WHO ARE MEDICAL DOCTORS**      )
19  **AND MEDICAL PERSONNEL,**       )
    **WHO VIOLATED PLAINTIFF'S**     )
20  **FEDERAL RIGHTS,** each and all in )
    both their individual and official )
21  capacities, and **KATHERINE**    )
    **BARGER, JANICE HAHN, HILDA**   )
22  **SOLIS, SHIELA KUEHL,** and     )
    **MARK RIDLEY-THOMAS,** each     )
23  and all are Los Angeles County   )
    supervisors, who are sued only in their )
24  official capacities, as policy-makers for )
    the Los Angeles County Sheriff's )
25                                    )

26

27

28

                           1

1  Department, and **50 UNKNOWN
   NAMED DEFENDANTS**[1],

2

3              Defendants.

4

## JURISDICTION AND VENUE

5

6      l.  The claims made herein are asserted pursuant to the United States

7  Constitution, and 42 U.S.C. l983, *et seq.*, and the jurisdiction of this Court is

8  invoked pursuant to 28 U.S.C. 1331 and 1343.

9      2.  The acts and/or omissions complained of occurred in the Central District

10  of California, and within its Western Division, and therefore, venue lies in this

11  District pursuant to 28 U.S.C. § l39l.

12  ## THE PARTIES

13     3.  Plaintiff was within the jurisdiction of the United States of America at all

14  times herein alleged, and was an inhabitant of the United States of America.

15     4.  Defendants are officials and employees/members of the Los Angeles

16  County Sheriff's Department ("LASD"); and the Los Angeles County Sheriff,

17  Alejandro Villanueva and the Los Angeles County supervisor defendants, Kathryn

18  Barger, Janice Hahn, Hilda Solis, Shiela Kuehl, and Mark Ridley-Thomas, each

19

20  _____

21  [1] The Los Angeles Sheriff's Dept. has a long-standing and chronic custom of its jail
    deputies covering up their badges and removing their name-plates, so that it is
22  made impossible to identify them, and the latest report on this custom was
    published on K-Cal, Channel 9 news, on November 27, 2020, at 8:07 p.m.  As a
23  result of this custom, plaintiff is unable to identify by name some of the defendants
    who violated plaintiff's constitutional rights.  Plaintiff attaches hereto and
24  incorporates herein the contents of "L.A. County sheriff says deputies can conceal
25  names during protests," an article that appears on pages 1-2 of the California
    sectioni of the Dec. 3, 2020 *Los Angeles Times*, and especially refers to the portion
26  of it that describes sheriff deputies previously placing duct-tape over their names,
27  in order to conceal their identities.  The contents of this footnote are incorporated
    in every allegation and count of this Fourth Amended Complaint.
28

and all are the policymakers for the LASD, and each of them is sued only in their official capacities.

5. Each and every defendant who is a natural person is sued in both his/her individual/personal capacity, as well as in his/her official capacity if he/she had any policymaking duties, functions, or responsibilities with respect to the matters alleged herein.

## FACTS COMMON TO ALL COUNTS

6. Each and every allegation set forth in each and every averment of this SAC hereby is incorporated by this reference in each and every other averment and allegation of this SAC.

7. Plaintiff was deprived of interests protected by the Constitution and/or laws of the United States of America, and each and every defendant caused, by commission or omission, such deprivation while acting under color of state law.

8. All acts and/or omissions perpetrated by each defendant, except any defendant sued only in his/her official capacity, was engaged in maliciously, callously, oppressively, wantonly, recklessly, with deliberate indifference to the rights allegedly violated, despicably, and with evil motive and/or intent, in disregard of the rights of each plaintiff.

9. Every defendant in his/her official capacity knowingly, or grossly negligently, or with deliberate indifference to the rights allegedly violated, caused to come into being, maintained, fostered, condoned, approved of, either before the fact or after the fact, ratified, and took no action to correct, an official policy, practice, procedure, or custom of permitting the occurrence of the categories of wrongs set forth in this pleading, and/or improperly, inadequately, with deliberate indifference to the constitutional or other federal rights of persons, grossly negligently, with reckless disregard to constitutional or other federal rights, failed properly to train, to supervise, to retrain, if necessary, to monitor, or to take

corrective action with respect to the sheriff deputies and with respect to the types of wrongful conduct alleged in this SAC, so that each one of them is legally responsible for all of the injuries and/or damages sustained by the plaintiff, pursuant to the principles set forth in *Monell v. Dept. of Social Services of the City of New York*, 436 U.S. 651 (1978), and its progeny.

All non-LASD defendants are sued herein on this theory, both in their individual/personal capacities and in their official capacities.

10. Also, it is alleged that prior failures to investigate LASD misconduct and/or to discipline LASD personnel found culpable for misconduct, inadequate investigations and/or inadequate discipline imposed for LASD misconduct, and/or a failure to investigate or to discipline the LASD defendants in this case for the alleged misconduct in this case, all make the defendants other than the LASD deputies liable for the LASD misconduct in this case.

11. The Los Angeles Sheriff's Dept. has a long-standing and chronic custom of its jail deputies covering up their badges and removing their name-plates, so that it is made impossible to identify them, and the latest report on this custom was published on K-Cal, Channel 9 news, on November 27, 2020, at 8:07 p.m. As a result of this custom, plaintiff is unable to identify by name some of the defendants who violated plaintiff's constitutional rights.

12. All supervisory defendants condoned, approved of, acquiesced in, and ratified all of the wrongful conduct alleged herein, and liability for this is not based on respondeat superior.

13. All defendants either personally participated in or directed, knew of the alleged wrongful conduct and violations, promulgated or implemented policies so deficient that the policies themselves are a repudiation of constitutional rights and therefore are the moving forces of the constitutional violations, based on the historical facts set forth herein.

14. Defendant Villanueva created the culture of the LASD, pursuant to which its deputies use excessive force, as it was used here, are deliberately indifferent to the serious medical needs of its prisoners and persons in its custody, make stops without reasonable suspicion, make arrests without probable cause, make entries of residences without probable cause, make searches without probable cause, and make both arrests and searches without warrants, and conceal the identities of jail deputies, so that prisoners, like plaintiff, will not be able to identify them, in order to name them as defendants and sue them.

15. Plaintiff was arrested without a warrant, and inside a residence to which he was denied entry and for which there was no warrant to make entry.

16. This culture of unconstitutionality includes the known existence within the LASD of fascistic gangs of deputies, who regularly engage in unconstitutional conduct, known to, but which has gone un-redressed by Villanueva, since he became sheriff, in 2018.

17. Plaintiff was a victim of this fascistic, gang culture.

18. The policies, practices, procedures, and customs alleged herein are not predicated upon isolated or sporadic events, but are predicated on events of long-standing duration, going back at least 20 years, and of long-standing frequency and consistency, so that they have become a traditional method of the LASD carrying-on its business, and there have been hundreds, if not thousands, of incidents in which LASD deputies have manhandled and used excessive force against detainees and have shown deliberate indifference to and callous disregard of the serious, known-to-be-serious medical needs of persons whom they detain and who are in their custody, conditions such as plaintiff's and his hernias.

19. The arresting deputies used excessive force by brutally handcuffing plaintiff, forcing him to walk too fast, when he complained that hurt his hernia, and generally man-handling plaintiff, and such force was not objectively reasonable,

since they did not need to use it and be brutal to plaintiff.  There were no circumstances facing the arresting deputies that warranted their very rough treatment of the plaintiff.  No reasonable law enforcement in the circumstances of plaintiff's arrest would have been as rough to plaintiff as these deputies were to the plaintiff.

20. The deputies who transported plaintiff to and from court used excessive force by brutally handcuffing plaintiff to other prisoners, forcing him to walk too fast, when he complained that hurt his hernia, and generally man-handling plaintiff, and such force was not objectively reasonable, since they did not need to use it and be brutal to plaintiff.  There were no circumstances facing the transporting deputies that warranted their very rough treatment of the plaintiff during his transportation, and without providing him with a wheelchair.  No reasonable law enforcement in the circumstances of plaintiff's transportation would have been as rough to plaintiff as these deputies were to the plaintiff, and reasonable officers would have provided a wheelchair to plaintiff.  This was not a mere lack of due care, but callous and deliberate indifference to plaintiff and his constitutional rights, under both the Eighth and Fourteenth Amendments. The conduct was intentional, grossly negligent, reckless, wanton, and oppressive.

21. The conduct of the arresting officers, as well as the conduct of the transporting officers, was integral to one another's conduct, so that as to both incidents, the arrest and the transporting, each officer was an integral part of the actions of the other officers with whom he or she participated.

22. "Speed walking" is forcing a person to walk at a faster pace that is inconsistent with his physical conduction and capabilities, and both the taking of the plaintiff to the sheriff vehicle after his arrest and the taking of the plaintiff to court, were done by making the plaintiff "speed walk," at a pace for which he was

unable and doing which caused him excruciating pain.  This constitutes both excessive force and deliberate indifference to serious medical needs.

23.  With deliberate indifference, the arresting defendants confiscated plaintiff's prescription medications, his walking cane, and his jewelry, all without plaintiff's consent to do so.

24. Each and all of the six defendants who transported plaintiff to court participated in that  transportation, and each was an integral part of the transportation. Thus, each, as well as the group, are liable for this violation. The same acts were committed by each such defendant. They acted as a group and each member of that group engaged in identical conduct, with each other member of that group, and each was an integral part of and participant in what was done to plaintiff.

25. Inadequate medical treatment was provided to plaintiff, that was done intentionally with respect to the conditions of plaintiff's confinement, that put plaintiff at substantial risk of suffering serious harm, which he did suffer, along with excruciating pain, defendants didn't take reasonably available measures to abate the risk, as a reasonable human being or official in the circumstances would have appreciated and taken, who would have the high degree or risk involved, to wit, inter alia, plaintiff suffering excruciating pain, which it was obvious would occur, and defendants failed to take such prudent and available measures, so that their acts and omissions were the but for and proximate causes of plaintiff's injuries and pain.  Not prescribing effective pain medication -- just prescribing aspirin -- to plaintiff was unreasonable and deliberately indifferent to plaintiff.  Each defendant who knew of plaintiff's extreme pain is liable for this, in that each one of them engaged in the same wrongful conduct, and each was an integral part of the deliberate indifference.

26. The named defendants' whom are alleged to have stolen plaintiff's outgoing mail and internal grievances, and who threatened plaintiff, were he to complain about their conduct thereby interfered with plaintiff's First Amendment right to petition government and violated plaintiff's constitutional right of access to the courts.

27. Insofar as plaintiff is able to know and set forth at this time, and because plaintiff at all times was a prisoner under defendants' sole control, and did not have any ready access to any means to record the identities of the defendants who did to plaintiff the wrongful things alleged herein, the unconstitutional conduct and the defendants who engaged in it are as follows:

28. In May 2019, plaintiff wrote letters to both the FBI and the Sheriff's Dept. inmate services supervisor, both at the Men's Central Jail (MCJ) and at Wayside, which he handed to defendant Alvarado (at MCJ), who ripped them up in front of plaintiff and then put them in one of Alvarado's pockets, and one of these incidents took place in Dorm 727. This constitutes civil rights violations, because Alvarado did these things with the specific intent to deprive plaintiff of his rights to petition government and to the right to free speech.

29. In May 2019, when plaintiff first was arrested by one male and one female deputy sheriff, both defendants herein (the male was about 33 years old, White or Hispanic, had two stripes on his shirt sleeve, was the senior deputy of the two of them, was about six feet to six feet one inch, about 185 pounds, had short, feather-cut hair, and physically was in good condition, and the female was about 23 years old, about five foot four inches, about 125 pounds, and had her brown hair in a bun), and both of them very roughly, physically grabbed plaintiff and restrained his arm, roughly spun him around, and the female searched plaintiff, all with unreasonable, excessive force.

30. The female deputy found $3,700.00, a cell phone, prescription liver medication, prescription kidney medication in plaintiff's pockets, and stole and never returned any of those items, all in deliberate indifference to plaintiff's constitutional rights and without due process.

31. These same two defendants then very physically roughly dragged plaintiff down stairs from the house towards their patrol car, all the while with the male defendant yelling at plaintiff "get your ass out of the house"; plaintiff told these two defendants that he could not move as rapidly as they were forcing him to go, and that this caused plaintiff extreme pain; these two defendants very roughly threw plaintiff into the back of their patrol car, they searched him again, and removed his "bro pac" from his waist, searched it, removed plaintiff's valuable, family, historical mementos from it, and never returned them, using excessive, unreasonable force and depriving plaintiff of his valuable property.

32. Then, at the MCJ, where plaintiff had been taken, and spent about 30 days, plaintiff continually and repeatedly, on about 100 plus occasions, to about 15 different jail employees, including doctors and nurses, four female and nine male, asked for prescription pain medications to treat horrible, excruciating pain he was experiencing from his diseased liver and kidneys and two hernias, and all he was given was aspirin, all in deliberate indifference to plaintiff's serious medical needs;

33. Plaintiff repeatedly requested to be given surgery for his hernias, a serious medical need, and these requests also were denied in deliberate indifference to plaintiff's rights.

34. Plaintiff was transferred to the jail's Wayside facility, where he spent approximately six months, and there plaintiff made about 100 requests for prescription medications to over 20 jail personnel, all of which were denied

35. At Wayside, plaintiff repeatedly was moved around roughly and at a pace at which plaintiff could not walk without severe pain, all in deliberate

indifference to plaintiff's medical conditions, and with unreasonable and excessive force.

36-130. Reserved.

## COUNT ONE

131.  At the time of the incident or incidents alleged in this case, the rights of persons within the jurisdiction of the United States of America under Amendment IV to the United States Constitution to be secure in home, person, papers, and effects, against unreasonable searches and/or seizures, and not to be subjected to the use of unreasonable or excessive force were in effect, and every LASD  defendant engaged in conduct (including actionable omissions, if applicable), that violated those Fourth Amendment rights, and thereby also violated the Fourteenth Amendment to the United States Constitution, and, by virtue thereof, each such LASD defendant is liable to plaintiff for damages, either nominal or compensatory, according to proof.

## COUNT TWO

132.  At the times of the incidents alleged in this case, the right of persons within the jurisdiction of the United States of America under Amendment VIII and Amendment XIV to the United States Constitution to be free from cruel and unusual punishment was in effect, and LASD defendants, and each of them, engaged in conduct, as set forth hereinabove, that violated that Eighth Amendment right, and thereby violated the Fourteenth Amendment to the United States Constitution, and, by virtue thereof, each such LASD defendant is liable to plaintiff for damages, either nominal or compensatory, according to proof.

## COUNT THREE

133.  Also, it is alleged that, there was an agreement or understanding between or among the LASD defendants for two or more of them, as to each separate incident alleged herein, to engage in the conduct alleged herein to be

wrongful, and that there was the commission of overt acts in furtherance of said conspiracies.

## COUNT FOUR

134.  Plaintiff as a Black man, and each LASD defendant agreed and/or understood, and conspired with at least one other LASD defendant, to deprive plaintiff of the equal protection of the laws, in violation of 42 U.S.C. 1985(3), based on a racially-motivated bias against plaintiff, who is a Black man, and the official capacity defendants could have, but did not, prevent the violations of Section 1985(3).

135. Therefore, every LASD defendant is liable to plaintiff under § 1985, and every governmental entity or official capacity defendant who had the power and/or opportunity and/or duty to prevent, but who failed to prevent, any violation of § 1985, is liable to any plaintiff under 42 U.S.C. § 1986.

136. Every official capacity defendant is liable to plaintiff for all wrongs alleged in this SAC pursuant to *Monell v. Dep't of Soc. Svcs. of the City of New York*, and this alleged conspiracy is separate from the simple, non-racially-based conspiracy alleged hereinabove.

## COUNT FIVE

137. By doing the things herein alleged as to plaintiff's outgoing mail and internal grievances, the named defendants violated plaintiff's First Amendment constitutional rights to petition government and to free speech.

## COUNT SIX

138. By doing the things herein alleged with respect to plaintiff's outgoing mail and internal grievances, the named defendants violated plaintiff's right of access to the courts.

139.  Plaintiff exhausted his grievances, both as matters of fact, prudentially, and legally.

140. Plaintiff is excused from exhausting his administrative remedies because defendants prevented him from so doing.

**WHEREFORE**, plaintiff requests damages, as follows, according to proof, against each defendant:

1.  General damages of at least one million dollars;

2. Punitive damages, to be paid personally by each defendant, of at least two million dollars;

3. Interest from the date of the wrongful conduct;

4. Costs of suit, including attorneys' fees; and,

5. Such other relief as may be warranted or is just and proper.

## DEMAND FOR JURY

Trial by jury of all issues is demanded.

ROBERT K. MAYBERRY

12-5-2020

12/3/2020                              L.A. County sheriff says deputies can conceal their names during protests - Los Angeles Times



ADVERTISEMENT



CALIFORNIA

# L.A. County sheriff says deputies can conceal their names during protests



Los Angeles County sheriff's deputies had their name tags obscured by riot gear at a demonstration against the shooting death of Dijon Kizzee. (Carolyn Cole / Los Angeles Times)

By ALENE TCHEKMEDYIAN, JAMES QUEALLY

DEC. 2, 2020 | 8:09 PM

Case 2:20-cv-00224-JLS-JDE   Document 47   Filed 12/08/20   Page 14 of 19   Page ID #:746

Los Angeles County Sheriff Alex Villanueva has authorized his deputies to conceal their names while policing protests and other civil disturbances.

Villanueva said Wednesday that the change to the department's long-standing practice of requiring deputies to wear tags engraved with their last names on their uniform shirts was in response to recent incidents in which deputies were harassed and had personal information revealed by protesters.

The details of the new rule are still being worked out but will leave it to deputies to choose whether to cover their name tag, a department spokesman said. Those who choose to do so will be identifiable through their badge numbers, the spokesman said.

The change came after a protest last week outside Men's Central Jail at which several deputies were filmed with duct tape covering their name tags. The move troubled activists and department watchdogs, who said such obfuscation made it much harder to hold deputies accountable and fueled distrust among communities demanding greater transparency and reforms by police agencies. Some said replacing deputies' names with a number will make it harder to identify deputies who they accuse of abusive conduct during chaotic situations at protests.

"You should be able to know the name of a deputy who you interact with," said Sean Kennedy, a law professor who serves on the Sheriff Civilian Oversight Commission. "There's no way that we can effectively monitor law enforcement if you can't even get the name of a deputy that you're interacting with in public who has taken some kind of use of force or action against you."

State law requires police officers to clearly display either their name or an identification number on their uniforms.

During a live Facebook broadcast Wednesday, Villanueva explained his reasoning, saying protesters have used deputies' name tags to find their home addresses and spread the information on social media. At times, he said, people have shown up at deputies' homes and vandalized their property.

"That is not exactly the intent of state law," Villanueva said.

Villanueva did not provide details of such incidents involving deputies but pledged to prosecute those involved.

He said his own name and address were plastered on banners hung from overpasses on several freeways and on fliers stuck to telephone poles that resembled fugitive wanted posters.

In response to a Times request for details of incidents in which deputies were identified and harassed, a spokesman for the Sheriff's Department did not give specific examples but said there were "numerous" incidents during protests in which protesters taunted deputies by pulling up social media pages belonging to them while they squared off.

"In several of these instances there were vile and repulsive comments made, as well as implied threats of violence," Lt. John Satterfield said.

A law enforcement source, who was not authorized to speak on the issue, told The Times that demonstrators flashed photos of the deputies' relatives and threatened to rape their wives and shoot their family members. Two protesters who have attended many protests said they had not witnessed such conduct.

"That's absolutely false. Protesters are not doing that... How can they even come up with something like that?" said Traci Carr, 30, who planned the protest outside the jail on Thanksgiving. "It's just a way of making us look like the bad guys."

In California, it's a misdemeanor to post identifying information about someone in order to put them in reasonable fear for their safety and cause them unwanted physical contact or harassment.

Demonstrators over the summer showed up at the home of Deputy Miguel Vega, who shot and killed 18-year-old Andres Guardado in an incident that generated weeks of protests and calls for an independent investigation. Police moved Vega's family from the home as protesters were "yelling at the residents and posting 'killer cop lives here,'" according to a brief entry about the incident in a Sheriff's Department log obtained by The Times. A flier was circulated with Vega's name and address next to a photo, saying he shot Guardado five times in the back.

Satterfield said the sheriff and his senior aides were unaware that deputies were planning to cover their names during the Thanksgiving event. A supervisor overseeing the deputies gave them the green light to do so and a department inquiry concluded that the actions were reasonable, Satterfield said.

The demonstrators who filmed deputies obscuring their name tags and badges had gathered in support of Emanuel Padilla, a 34-year-old toy designer who has been charged with attempting to wreck a train during a protest this year. Critics have decried the charges, claiming they are trumped up and meant as retaliation against a protester. Padilla is being held at Men's Central Jail without bail, jail records show.

Carr, the organizer, said about 30 demonstrators were outnumbered by the roughly 50 deputies who policed the event.

"It's pretty terrifying when you're trying to have a potluck and then you look up and there's sheriff's deputies with rubber bullet guns," she said.

Several protesters said the deputies, many of whom were carrying launchers that fire foam rounds or riot shields, refused to identify themselves when questioned. In a video provided to The Times, one deputy would identify himself only as "emergency response sergeant one" when asked about the obscured name tags.

Some activists and independent journalists said deputies have been obscuring their names at demonstrations for months, with the problem becoming increasingly noticeable during hostile interactions between protesters and deputies in South L.A. after the fatal deputy shooting of Dijon Kizzee.

"It's an accountability issue. They are public servants. They are supposedly keeping us safe," said 32-year-old demonstrator Mary Mattingly, who also attended the Thanksgiving potluck. "If they are covering their badge numbers and they are covering their names ... we can't hold them accountable for anything that they are doing."

Other police agencies have also changed how deputies identify themselves in the field.

The Beverly Hills Police Department is allowing officers to cover their name tags while assigned to protests. And the Portland Police Bureau in Oregon recently assigned each of its officers a three-digit identification number to wear on their helmets during protests in part due to demonstrators repeatedly staging events at the homes of police officials.

CALIFORNIA

RECEIVED

2020 DEC -8 AM 1: 22

CLERK U.S. DISTRICT COURT
CENTRAL DIST OF CALIF.
SANTA ANA

BY_____



Express

Extremely Urgent

For ... A
4352
12/06
1
10:30 ...

787

...ss® Shipments Only

...ole with the containe...
...and our limits...
...g document, the...

For more information...
locations, go to fedex.com, or contact your near...
...dEx Express services.

© 2018 FedEx 155475/155476 REV 3/18

See how FedEx connects the world in responsible
environment.fedex.com. Join our efforts by re...

TRK#
(2D1) 7809 6649 4352

WZ EMTA

ORIGIN ID:ENTA (323) 810-7273
LANETTE LAVENDER
1146 W 89TH ST
LOS ANGELES, CA 90044
UNITED STATES US

TO US DISTRICT COURT OF CALIFORNIA
OFFICE OF THE CLERK
255 E TEMPLE ST
ROOM 180
LOS ANGELES CA 90012

SHIP DATE: 07DEC20
ACTWGT: 0.45 LB
CAD: 6906949/SSF02121

BILL CREDIT CARD

TUE - 08 DEC 10:30A
PRIORITY OVERNIGHT

90012
CA-US LAX

DEC - 8 2020

JDE

FedEx
Express

◄ Insert shipping
document here.

# FedEx

## Express



ORIGIN ID:EMTA  (323) 810-7273
LYNETTE LAVENDER
1146 W 89TH ST

LOS ANGELES, CA 90044
UNITED STATES US

TO US DISTRICT COURT OF CALIFORNI
OFFICE OF THE CLERK
255 E TEMPLE ST
ROOM 180
LOS ANGELES CA 90012
(000) 000-0000

SHIP DATE: 07DEC20
ACTWGT: 0.45 LB
CAD: 8999848/SSFG121

BILL CREDIT CARD

WZ EMTA

TRK#
(2D1)  7809 6649 4352

TUE - 08 DEC 10:30
PRIORITY OVERNIGHT

90012
CA-US  LAX